Eric Fong (#26030)
FONG LAW
569 Division St., Ste 300
Port Orchard, WA 98366
(360) 621-9557
eric@ericfonglaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF WASHINGTON, EASTERN DIVISION

| | |
|---|---|
| WENDY FARRIS,<br><br>        Plaintiff,<br><br>vs.<br><br>LOREN CULP, REPUBLIC POLICE DEPARTMENT, CHRISTINE CLARK, FERRY COUNTY SHERIFF,<br><br>        Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Case No:<br><br>Judge: |

Wendy Farris (Farris), by and through her attorneys, submit this Complaint against Defendants, demand a jury trial, and state as follows:

## <u>INTRODUCTION</u>

1.      Without reasonable suspicion or probable cause, Ms. Farris was detained, and subjected to an improperly conducted K-9 search.    Despite her requests to submit to a chemical test to prove her innocence, she was denied.

2.      Despite her innocence, Ms. Farris was subjected to incarceration at the Ferry County Jail for two days, prosecuted unsuccessfully in two separate criminal matters, and ultimately lost her license.

3.      Defendants Culp and Clark directly violated Farris' constitutional rights, abetted by Ferris County's failure to adequately train new deputies and Republic's policy, established by its policymaker, of improperly conducting K-9 searches through intentional cross contamination. Plaintiff should be afforded relief.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's cause of action arising under the Constitution of the United States and 42 U.S.C. § 1983 and pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. This Court has supplemental jurisdiction over Plaintiff's causes of action arising under Washington state law pursuant to 28 U.S.C. § 1367.

5.      Venue lies in the United States District Court for the Eastern District of Washington because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in and by Republic, Washington. 28 U.S.C. § 1391(b)(2).

6.      Defendants are subject to personal jurisdiction within this district.

## PARTIES

7.      Plaintiff Wendy Farris (Farris) is a 51-year-old grandmother from Great Falls, Montana.

8.      Upon information and belief, Defendant Officer Clark was, at all relevant time, a deputy with the Ferry County Sheriff's Department and a resident of Washington. At all times relevant Officer Clark was acting under the color of law and within the scope of her employment.

9.      Upon information and belief, Loren Culp was, at all relevant time, a Police Chief with Republic Police Department. And a resident of Washington at all times relevant Loren Culp was acting under the color of law and within the scope of his employment. As police chief, Loren Culp is a policy maker for the Republic Police Department.

10.     Ferry County is a municipality located within the State of Washington and is responsible for the creation and supervision of the Ferry County Sheriff's Department. Under state law, Ferry County is vicariously liable for acts or omissions committed by employees of the Sheriff's Department within the scope of their employment.

11.     The City of Republic is a municipality located within the State of Washington and is responsible for the creation and supervision of the Republic Police

3

Department. Under state law, the City of Republic is vicariously liable for acts or omissions committed by employees of the Police Department within the scope of their employment.

## GENERAL ALLEGATIONS

12.    In early August, 2018, Wendy Farris, a forty-nine year old car salesman, realtor, and grandmother, left her home in Great Falls, Montana on what would turn into a whirlwind trip across the western United States.

13.    Initially, Wendy intended to travel to Oregon and spend time with her daughter and her grandchildren for a grandchild's birthday. After a trip to Salt Lake City, and back to Oregon, Wendy was contacted by a dear friend of hers, Vera Hamilton, who lived near Republic Washington.    It was Wendy's initial intent to have Vera's son come to Oregon to spend time with Wendy's children.    However, this didn't work out as planned.

14.    While Wendy was working out the details of this trip to bring Vera's son to Oregon, Vera's estranged daughter (a runaway) had reached out and told her mom she was in California, was homeless, and wanted to come home.

15.    Although Wendy had promised her daughter she would be there for her grandchild's birthday, Wendy felt compelled to help Vera.

4

16.    Wendy told her daughter she would help get the Vera's daughter home safe, and make it back in time for the birthday celebration.

17.    In an attempt to make this happen, Wendy and Vera drove to California in Wendy's car, picked up the Vera's daughter, and drove all the way back to Republic Washington in a matter of a few days.

18.    The night of August 17, 2018 was a long night for Wendy.    Between herself and Vera, they drove all night, ultimately arriving at Vera's residence outside Republic early on the morning of the 18th.

19.    By the time she dropped Vera and her children off, Wendy was exhausted. Vera asked Wendy to stay and get some rest, but Wendy had promised her daughter that she would make it back to Oregon in time for the grandchild's birthday, and she intended to keep that promise. She turned her car around, and headed back to Oregon.

20.    Wendy didn't get far before the effects of sleep deprivation and driving overtook her.    Concerned about falling asleep at the wheel, Wendy did the right thing. She found a safe, wide, approach on the side of the road where she would not present a hazard, pulled over, put her keys in her pocket, locked her doors, and went to sleep.

21.    Wendy was sound asleep when she was awakened by banging on her window.    She woke from a very deep sleep in a fog.    She was disoriented and confused. What was that noise?    Where am I?    Who is banging on my window?

22.    It took wendy a minute to figure out someone was banging on her window.   When she did, she looked up out of her driver's side window into the bright sunlight, and saw the silhouette of a person.

23.    Still groggy from being awakened from a deep sleep, Wendy squinted into the light and recognized what she thought was a law enforcement officer standing next to her car.   She was confused … why was this sheriff here?   What had she done wrong?   What is going on?

24.    The deputy sheriff, Christine Clark, had been sent out by dispatch on a welfare check based on a call from a concerned citizen who had seen Wendy sleeping in her car and was concerned there may be something wrong.

25.    When Deputy Clark arrived she observed the car was pulled safely off the road, and the female driver, (Wendy Farris) was asleep in her front seat. According to Deputy Clark's observations, Wendy was sound asleep. Inexplicably, instead of initiating contact with Wendy to see if she was okay, Clark instead called for an ambulance – unnecessarily escalating the welfare check without even checking to see what was going on.

26.    After calling for an ambulance, Clark knocked on the driver's door window. Wendy didn't stir.   Clark knocked again, and Wendy stirred.   Clark noted

Wendy awoke out of a dead sleep in a state of confusion.   Clark reported Wendy initially did not know where she was, or where she was going.

27.    It took Wendy a few minutes to fully wake up.   After getting her bearings, adjusting to the bright light, and finding her cognition, Wendy cooperated with Clark and answered every question asked of her.   Clark grilled her with questions, asking who she was, where she was going, where she was coming from, why she was sleeping in her car.

28.    Wendy answered all of the questions clearly and cognizably.

29.    Clark asked Wendy if she had been drinking or ingesting any narcotics or other drugs.   Wendy responded no, she doesn't drink or do drugs.   She told Clark she was fine, she was just tired and pulled over to take a nap.

30.    Clark asked Wendy who the local resident was that had been with her on her trip, Wendy told her "Vera Hamilton". Unbeknownst to Wendy at that time, Clark has a long-standing personal dislike for Vera Hamilton.   Hamilton had previously filed complaints against Clark with the Ferry County Sheriff's Office over Hamilton's mishandling of a call involving Hamilton's cattle.

31.    Clark explained an ambulance had been called, and though Farris denied the need to be medically evaluated, Clark insisted Farris could not leave until she had been medically cleared.

7

32.    Despite not detecting any odor of intoxicants, or having any other justifiable reasonable suspicion to do so, Clark expanded the scope of the stop, without any logical justification, into a DUI investigation.

33.    Clark told Wendy to step out of the car.   Wendy did as she was told. When she stepped out of the vehicle, Clark took control of Wendy's person, turned Wendy toward the car and frisked her.

34.    Confused, Wendy asked Clark why she was being patted down. Clark again asked Wendy about alcohol or drugs.    Wendy again confirmed that she had not been drinking, and had not been taking any drugs; she was simply taking a nap because she was exhausted and needed a little sleep before continuing a long drive to Oregon.

35.    At this point Wendy realized Clark believed she was intoxicated. Wendy requested a test to check her for alcohol or drugs. Clark declined the request.

36.    Thinking she had to in order to be allowed to leave, Wendy ultimately allowed the ambulance crew to evaluate her.   The crew checked Wendy and found her vitals were within normal range, and there did not appear to be anything physically wrong with her.    Wendy again requested a blood or breath test.

37.    By this point, Wendy was becoming more agitated.   She hadn't gotten more than a few hours of quality sleep in days.   She was exhausted and she just wanted to be left alone.

38.     Wendy is not a drinker, and is not a drug user.   She has never been arrested, and other than minor traffic infractions has never had any negative contact with law enforcement.    Being suspected of driving under the influence was extremely stressful for Wendy.   The fact that Clark refused to believe her was escalating her stress.   Wendy wanted the test done, and she wanted these people to leave her alone.

39.     Clark refused to submit Wendy to a BAC test, instead demanding that she submit to field sobriety tests.    A very agitated Wendy agreed to perform the tests.

40.     Wendy requested EMS staff remain because, by this time, she did not trust Clark.

41.     Clark improperly conducted the field sobriety tests and improperly instructed Wendy on how to perform the tests.

42.     Clark positioned Farris to take the field sobriety tests in a spot where the tests themselves would not be caught on camera.

43.     According to Clark, Wendy failed all of the field sobriety tests.    Wendy was flabbergasted.   She knew she was stone-cold sober and she felt like she passed each test. When Clark placed her under arrest, Wendy, in a state of near panic, again asked for a breath or blood test to prove she was not under the influence.

44.     Clark's report is void of critical information.    Without limitation, she fails to note that Wendy Ferris had been awake for nearly 24 hour; that Wendy was

exhausted and had just been awoken from a very deep sleep (of course she was disoriented); further, that when confronted, Wendy was forced to look out into the bright sunlight to respond to the officer (of course her pupils were constricted); that Wendy did not have actual physical control of her vehicle when the the contact initiated;      Any properly trained and properly supervised officer following proper procedure, practice and custom would have understood this, and handled this call much differently.

45.     After placing Wendy under arrest, Clark called for City of Republic police officer and newly certified K-9 handler, Loren Culp and his dog, "Karma", to come and search the car for narcotics

46.     When Culp arrived, Clark informed Culp that Wendy was under arrest for DUI, with no recognizable odor of intoxicants emitting from her person.

47.     Karma is trained to detect the presence of marijuana, heroin, methamphetamine, cocaine, and MDMA in the vehicle.   When Karma locates narcotics, he responds with a "passive" alert by immediately sitting.

48.     Culp released Karma from his kennel, attached he search leash, picked up a scent toy as a reward for Karma, and brought the dog out of the patrol car.

49.     Culp walked Karma around Wendy's car, starting at the trunk, moving around the right rear quarter-panel to the front of the car, around the front, down the

10

left side ending at left rear bumper area.    As he moved, he asked Karma to seek out the scent of narcotics.    Karma did not alert.

50.    Culp then took Karma around the car a second time in the same manner as the first pass. The dog had almost finished the second pass without an alert when Culp can be seen in the body camera footage, flat-handing the side of the car near the left rear quarter-panel while asking Karma to seek in that location.    Karma can then be seen looking to Culp who you cannot see on the body camera video footage.    After appearing to make eye contact with Culp, Karma sits.

51.    Karma's alert was not reliable.    Culp had been handling the scent toy with the same hand he was using to flat-hand the car and ask Karma to seek in that area. This contaminates the area to be searched and can trigger a false alert. It is further debatable whether Culp encouraged the dog to alert through his own actions – behind the camera.

52.    Culp either intentionally cross contaminated the vehicle, or he was not trained on basic cross-contamination protocol.

53.    Upon information and belief, Culp was either following City of Republic Police Department policy, practices or custom while handling K-9 Karma on this call; or City of Republic policy, practice or custom is void of any directive regarding proper

handling of the K-9 during a vehicle stop.    In either case, the result is a violation of the constitutional rights of Wendy Farris and others similarly situated.

54.    Based on the manipulated alert by Karma, the officers on scene searched Wendy's car.    No evidence of illicit substances was found.

55.    The officers did, however, find roughly $5,000 in cash. This was money Wendy kept with herself when she traveled, and in this specific instance was to be used for necessities and gifts for her children and grandchildren.

56.    When officers discovered Wendy was carrying a substantial amount of cash, they set out to find a reason to confiscate the cash under a justified drug forfeiture. In short, the vehicle was impounded and ripped apart in an effort to find drugs so the officers and their respective departments can lay claim to the cash as a forfeiture.

57.    Despite the overzealous search that ultimately permanently damaged Wendy's vehicle, no drugs were found.

58.    Clark booked Wendy into the Ferry County Jail.

59.    Clark processed Wendy for DUI, and had her sit in the room where Blood Alcohol Content (BAC) tests are administered within the jail.

60.    According to Clark, Wendy denied this test, even though implied consent warnings, constitutional rights, and officer observation data points are wholly lacking.

12

61.     What actually happened was Wendy, who had been requesting a BAC test repeatedly throughout the incident, had been allowed to speak to a public defender. The public defender told Wendy not to say anything and he would be right down. Before the public defender arrived, Clark asked Wendy to submit to a BAC test on the intoxilizer. Wendy did not decline, she simply advised the deputy that she had been told not to answer questions until her attorney arrived.

62.     After Wendy's attorney arrived, Wendy was transported to the clinic for a blood draw obtained for a toxicology screen.   The results of these tests were negative for any controlled substance and for alcohol.

63.     Clark cited Wendy with DUI in violation of Section 46.61.504 - Physical control of vehicle under the influence.

64.     Clark forwarded these charges to the Ferry County Prosecutor.

65.     Wendy was booked on a Friday and remained in Ferry County Jail until Monday.

66.     On Monday, Wendy had a hearing on the DUI charge and the Ferry County Prosecutor dropped the charge for lack of probable cause while the blood toxicology screening was pending.

67.     Wendy was subsequently released, though she missed her grandson's birthday due to her incarceration.

68.     Wendy appeared at a Ferry County Commissioner's Hearing the same day she was released to complain about Deputy Clark and her treatment.

69.     In retaliation, Clark submitted the DUI arrest to the State of Washington Department of Licensing for an administrative decision on Wendy's license.   Wendy had no idea Clark had done this.

70.     Though Ferry County dismissed the DUI charge, it failed to inform the Department of Licensing of the dismissal.

71.     The paperwork submitted by Clark to the Department of Licensing alleged Wendy refused to submit to a blood alcohol content test.

72.     Wendy had not refused to take a breathalyzer - she had requested a test multiple times and was ultimately denied by Clark.

73.     Because Clark falsely alleged Wendy refused to take a BAC test, Wendy's driving privileges were suspended for a year; again, Wendy was unaware this had taken place – in fact, because she was traveling and did not have access to her mail, she did not learn of the license suspension until after the deadline to contest the allegation had passed.

74.     Because Clark falsely alleged Wendy refused to take a BAC test, after Wendy's driving privileges were suspended for a year she was required to obtain SR-22 insurance in order to drive her vehicle.   For Wendy, SR-22 insurance is cost

prohibitive. As a result, Wendy has not driven since she discovered her license was suspended.

75.    As a result of unjustifiable suspension of her license, Wendy lost job opportunities.

76.    Based on Clark's false assertion that Wendy refused to submit to a breathalyzer, Ferry County prosecutor again charged Wendy, this time DRIVING UNDER THE INFLUENCE (REFUSAL).

77.    Wendy had to drive from Montana to Washington to address the new charge, which again was dismissed.

78.    Following her arrest, Wendy continually contacted the Ferry County Prosecutor's office to obtain her blood toxicology screen results.

79.    The Ferry County Prosecutor's Office repeatedly represented the screen was not complete and it could take a long time to get results because the lab is busy.

80.    In approximately May, 2020 Wendy got tired of waiting and contacted the lab directly.   She was advised that the results were completed and returned to Ferry County on March 27th, 2019.   They were negative for all substances.

81.    No one from Ferry County or City of Republic has ever reached out to Wendy to let her know the outcome of the complaint she submitted against Clark and

Culp. Neither have they ever offered to pay for damages caused by Culp during his overzealous search of her car.

82.    Neither Clark nor Culp have ever reached out to Wendy to apologize.

83.    As a result of the acts or omissions of the named defendants as set forth herein above Wendy Farris suffered economic damages, emotional distress, and other damages in an amount to be fully set forth at trial.

84.    Defendant Culp and Clark are now liable, jointly and severally, for the damages resulting from their negligent and intentional acts or omissions.

## FIRST CLAIM FOR RELIEF
### *42 U.S.C. 1983 for Violation of Wendy Farris' Right to Freedom from Unreasonable Searches and Seizures*

85.    The foregoing paragraphs are incorporated by reference.

### A. *Expansion of the scope by Deputy Clark*

86.    Clark detained Wendy Farris on an investigatory stop upon receiving a call that Wendy was slumped over in her car, and parked off the side of the road. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Fla. v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325–26, 75 L. Ed. 2d 229 (1983)

16

87.    The purpose of the investigatory stop was to make sure Farris was okay. Farris explained what she was doing on the side of the road, where she was coming from, where she was going, and she indicated she did not need medical assistance. At this point, the purpose of the stop had been satisfied yet Clark required Farris to submit to medical evaluation and subsequently submit to field sobriety test.

88.    The police may not extend an otherwise completed stop absent reasonable suspicion. *Rodriguez v. United States*, 575 U.S. 348, 353, 135 S. Ct. 1609, 1614, 191 L. Ed. 2d 492 (2015). Clark did not have reasonable suspicion to expand the scope of her stop into a DUI investigation. Clark did not detect the odor of alcohol or any other illicit substance, she did not observe a poor driving. Other than symptoms expected from a person abruptly awakened (initial confusion and dilated pupils), there was no basis for reasonable suspicion.

89.    The expansion of the stop was unconstitutional and Farris claims damages under 42 U.S.C. § 1983 for the injuries caused by defendant's for violations of Farris' constitutional rights to freedom from unreasonable searches and seizures.

90.    As a direct and proximate result of defendant's actions, Farris has suffered severe and substantial damages, including emotional distress, incarceration for two days at the Ferry County Jail, and loss of license.

### B. *False Arrest by Deputy Clark*

91.    After expanding the scope of the stop, Deputy Clark forced Wendy Farris to submit to field sobriety tests.

92.    Clark improperly conducted the field sobriety tests and failed to properly instruct Wendy Farris on the tests.

93.    Because the tests were improperly conducted, the results of the test were not valid.

Wendy Farris performed well on the field sobriety tests, though Clark falsely reported she had failed the tests.

94.    Wendy Farris repeatedly requested a BAC testing to prove her innocence, but Clark refused.

95.    Clark lacked the necessary reasonable suspicion to escalate the welfare check to a DUI investigation, and lacked probable cause to justify an arrest where the field sobriety tests were Clark's sole piece of evidence; and, because the tests were improperly conduct, the results are not valid.

96.    The arrest was unconstitutional and Wendy Farris claims damages under 42 U.S.C. § 1983 for the injuries caused by the defendants for violations of Wendy Farris' constitutional rights to freedom from unreasonable searches and seizures.

18

97.    As a direct and proximate result of defendant's actions, Wendy Farris suffered severe and substantial damages, including economic loss, emotional distress, incarceration for two days at the Ferry County Jail, and loss of license.

*C. Vehicle Search without Probable Cause*

98.    Defendant Loren Culp of the Republic Police Department arrived on scene after Farris had already been arrested.

99.    Clark requested Culp conduct a K-9 search of the vehicle, advising him Wendy Farris was arrested for intoxication with no odor.

100.    Culp deployed his K-9, Karma, and completed one pass of the vehicle – with no alert.

101.    On the second pass, Culp touched his hand to Farris' vehicle after handling a scent toy resulting in cross-contamination. The dog ultimately alerted after Culp clearly flat-handed an area of the rear left quarter-panel of the vehicle resulting in obvious cross-contamination.

102.    Beyond being based upon an unlawful arrest, the improper handling of the K-9 resulted in a false alert which should not have been considered in the probable cause analysis.

103.    Without the dog signaling, neither Culp nor Clark could have torn apart Wendy Farris' vehicle in search of drugs and paraphernalia.

104.    Wendy Farris' vehicle was ultimately turned over in search of contraband though none was found.

105.    The expansion of the stop was unconstitutional and Wendy Farris claims damages under 42 U.S.C. § 1983 for the injuries caused by defendants for violations of her constitutional rights to freedom from unreasonable searches and seizures.

106.    As a direct and proximate result of defendant's actions, Wendy Farris has suffered severe and substantial damages, including economic damages, emotional distress, incarceration for two days at the Ferry County Jail, and loss of license.

107.    The vehicle search was unconstitutional for want of probable cause. and Wendy Farris claims damages under 42 U.S.C. § 1983 for the injuries caused by defendant's for violations of her constitutional rights to freedom from unreasonable searches and seizures.

108.    As a direct and proximate result of defendant's actions, Farris has suffered severe and substantial damages, including economic damages, emotional distress, incarceration for two days at the Ferry County Jail, and loss of license.

## SECOND CLAIM FOR RELIEF

*42 U.S.C. 1983 Violation due to Malicious Prosecution against Deputy Clark*

109.  The foregoing paragraphs are incorporated by reference.

110.  Defendant Clark's actions initiated criminal charges against Wendy Farris for DUI while in physical control of the vehicle.

111.  When she was contacted by Clark, Wendy Farris was sound asleep in her safely parked car, with her car keys in her pocket; as such, under the statute, Wendy Farris could not be convicted of Physical Control while under the Influence.

112.  Deputy Clark provided false information to the Ferry County Prosecutor's Office so the Prosecutor would pursue charges. For example, without limitation, Clark reported to the Prosecutor's Office that Wendy Farris had refused a BAC =test when that was not true.

113.  Defendant lacked probable cause to commence and pursue criminal charges against Wendy Farris.

114.  Defendant further conducted a negligent investigation into the facts.

115.  Both of Wendy Farris' cases were dismissed by the Prosecutor for want of probable cause

116.  As a direct and proximate result of defendant's conduct, Wendy Farris has suffered severe and substantial harm.

## **THIRD CLAIM FOR RELIEF**

### *42 U.S.C. 1983 Violation (Monell Liability) against Ferry County and City of Republic*

117.   The foregoing paragraphs are incorporated by reference.

A. *City of Republic is Responsible for the Practices of Its Policymaker*

118.   Defendant Culp, as chief of police, is a policymaker for Republic' Police Department.

119.   Culp, as policymaker, created a practice for Republic's Police Department where officers intentionally cross-contaminate vehicles to influence a K-9's search.

120.   Culp as a policy maker, created a practice where Republic's Police Department negligently cross-contaminate to influence a K-9's search.

121.   Culp, as a policy maker, negligently created a practice where officers of the department are encouraged to violate a citizen's rights, and destroy their property, in the interest of personal gain and potential forfeiture opportunities.

122.   These unconstitutional practices were a moving force behind the unconstitutional arrest of Wendy Farris; and unconstitutional search of her vehicle.

123.   As a direct and proximate result of defendants' conduct, Wendy Farris has suffered severe and substantial harm.

B. *Ferry County is liable for failure to train*

124.    At the time of the traffic stop, Deputy Clark was a newly minted officer.

125.    As evidenced by the traffic stop, Ferry County did not provide Clark sufficient training.

126.    Specifically, Ferry County did not sufficiently train Clark regarding the indicia needed to establish reasonable suspicion to commence a DUI investigation and the proper administration of field sobriety tests.

127.    It was obvious to Ferry County that failure to train its deputies on reasonable suspicion and the administration of field sobriety tests would likely lead to constitutional violations were reasonable suspicion and field sobriety tests arise daily.

128.    Despite its obviousness, Ferry County failed to implement a training program sufficient to address the identified deficiencies.

129.    As a result of this practice, Clark expanded the stop without reasonable suspicion, improperly administered the FSTs, improperly instructed Farris on performing the FSTs, improperly analyzed the tests and improperly concluded Farris was likely under the influence.

130.    This unconstitutional practice was a moving force behind the unconstitutional search, seizure, and arrest of Wendy Farris.

23

131.    Similarly, Clark's irresponsible, unethical, and retaliatory attack on Wendy Farris' driving privileges is indicative of systemic issues related to a lack of formal training and oversight.

132.    The lack of training and oversight of Clark in relation to the retaliatory submission of the false report to the department of licensing resulted a violation of Wendy Farris' right to travel without Fifth Amendment due process guarantees.

133.    As a direct and proximate result of defendants' conduct, Wendy Farris has suffered severe and substantial harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests this court enter judgment against Defendants and provide the following relief:

1.    Compensatory damages in whatever amount exclusive of costs and interest, that Plaintiff is found to be entitled;

2.    General damages for Plaintiff's physical and emotional pain and suffering

3.    Punitive/exemplary damages against Defendants in whatever amount, exclusive of costs and interest, that Plaintiff is found to be entitled;

4.    For interest and costs as allowed by law;

5.    For attorney fees as allowed by 42 U.S.C. § 1988;

24

6.    Such other and further relief as the court deems appropriate

## **JURY DEMAND**

Plaintiff hereby demands that all claims herein pled be tried to a jury of 12 persons.

DATED this 18th day of August, 2020.


/s/ Eric Fong_____
FONG LAW
*Counsel for Plaintiff*